FRED JENSMA, appellant, v. GEORGE EUGENE ALLEN, appellee.

No. 49053.

(Reported in 81 N.W.2d 476)

MARCH 5, 1957.

Clarke, Smith & Emery, of Des Moines, for appellant.

Siegers & Bedell, of Newton, for appellee.

SMITH, J.—Plaintiff, Jensma, was a crop tenant on "the cropland" of defendant's quarter section. Both were farmers and lived a mile apart. Under their lease they were to share the crop "on a 50-50" basis. Many of its provisions are not pertinent here. Near its end however was a paragraph with which we shall have some concern:

"The stock fields shall belong to the landlord, and if there is an undue amount of corn remaining in the cornfield after picking, the tenant agrees to pick the same and divide equally with the landlord."

Plaintiff testifies that the term "stock fields" means "all the acres that was [had been?] in corn after the harvesting was

completed"; and that "harvesting" means "getting the corn from the field." That of course leaves us to wrestle with the apparently, but not really, difficult phrase, "an undue amount of corn."

Plaintiff's petition alleged that on or about October 25, 1954, he "was the owner with a right to possession of one half of the unpicked corn growing" on the land; and that beginning on or about that date "defendant wrongfully converted said corn of the plaintiff to his own use by turning his cattle and horses" in "where they ate or otherwise rendered unfit for use said corn of the plaintiff." It further alleged the amount was more than 675 bushels of the value of $421.87, for which amount judgment was demanded.

Defendant answered, denying plaintiff's ownership or right of possession "of any part of the unpicked corn * * * at any time material to this action", denied generally the alleged conversion and in a separate paragraph alleged "that during the fall of 1954 the plaintiff picked all of the corn * * * required by the terms of said lease; removed all corn picking equipment from the premises and abandoned such corn as remained after picking"; and that "after the picking of the corn no undue amount of corn then remained in the field."

The lease under which the parties operated was entered into January 21, 1949. It was for a term of one year but the parties had continued to operate under it for the intervening years until this trouble arose.

Plaintiff explains: "In 1954 I raised seed corn * * * for a hybrid seed company to be graded and bagged and sold to farmers for corn to plant. We plant two rows of pollinator and eight rows of seed line. The seed company (Pfister Associated Growers) purchases the seed line. They do not purchase the pollinator rows" (nor) "the end rows." That part was to be picked by plaintiff and equally divided with defendant.

"The seed company * * * select the time when they want to come and get it" (the "seed line"). "They come whether or not the pollinator rows are out of the field. * * * The tenant furnishes the men and tractor * * * to haul the corn from the picker to an elevator set up in the field to transfer the corn

to trucks to be delivered to the seed house." In 1954, he says, all the end rows and part of the pollinator were out before the seed company came.

Plaintiff further testifies that in 1954 he finished harvesting the pollinator corn on Saturday, October 23. He recalls the seed line harvesting had been completed by the seed company the first part of that week. He says he had a conversation with defendant during that week—about Thursday—as to whether they could "work out a deal whereby we could eliminate picking up the down corn in the field" so he (plaintiff) "could take a few extra bushels" for himself (out of the corn already picked) and defendant could then turn in his livestock and "pasture what was left" without waiting for it to be gathered and divided.

(We nonfarmers understand that meant a proposed plan whereby defendant could turn his stock in promptly after the picker finished and allow plaintiff an estimated equivalent larger portion of the already picked corn in lieu of the 50-50 division as provided by the lease of the "undue amount" of down corn remaining.)

He testifies that after some discussion they came to no conclusion—"I said, 'Well, you go out and look at it, I'll do the same. And I would like to work something out, anything to keep from picking it up like I did in the past.' There was never any answer in reply."

He thinks that was "about Thursday" and says he finished husking (the pollinator and end rows) on Saturday. Monday (October 25) following, he discovered defendant's cattle in the cornfield, and later horses also. He went right up and talked with defendant. They argued and quarrelled and nearly came to blows. (Their respective ages are apparently not shown, so we venture no opinion on what might have been the outcome. The verbal battle was good.) On October 27 defendant served notice of termination of the lease.

The testimony bearing on the value of the remaining corn on the ground need not be recounted except as it relates to the question of "undue amount" under the quoted language of the lease and the measure of damage for the jury to employ. That part we shall consider as we proceed.

When plaintiff rested defendant moved for a directed verdict, which motion was sustained. Plaintiff's testimony stands uncontradicted. This appeal by plaintiff followed.

I. The motion to direct asserts insufficiency of the evidence to establish the pleaded cause of action. The ten lettered subparagraphs do not represent that many separate "grounds"; nor do the nine numbered "errors" assigned and argued by plaintiff on appeal mean that many distinct subjects requiring separate rulings. Most of them in each case are statements of propositions or of steps in the argument by which the party reaches his conclusion.

We say this by way of denial of Division I of appellant's brief which claims the trial court erred by failure to comply with rule 118 of our Rules of Civil Procedure, requiring separate rulings upon separate grounds or parts of a motion. The dilemma confronting the trial court in attempting to comply strictly with the rule here is apparent. Before there could have been separate rulings, some classification and separation of distinct *grounds* or parts would have been necessary.

The trial court by a belated "Findings of Fact and Conclusions of Law" (entered after service of notice of appeal but at plaintiff's request) corrected the record by a sort of nunc pro tunc entry to read: "The defendant's motion (to direct verdict) is sustained as to paragraph 1 and as to each and all of the reasons stated in paragraphs 1*a* to 1*j* therein inclusive."

A second notice of appeal was thereafter served referring to this later "correction" as the final order. Defendant has not objected to the procedure and as plaintiff is in no position to do so we merely say it was, at most, error without prejudice. Melsha v. Tribune Publishing Co., 243 Iowa 350, 354, 51 N.W.2d 425; Hull v. Bishop-Stoddard Cafeteria, 238 Iowa 650, 667, 26 N.W.2d 429.

II. We observe defendant's brief uses the spelling "stalk" fields instead of "stock" fields as written in the lease. The variance does not seem to mean any disagreement over the meaning. The reference is apparently understood to be to "corn stalk fields" and that more-common spelling perhaps clarifies the meaning for some.

Defendant argues plaintiff had no such right or interest in

the corn remaining after the mechanical picker left as would support an action for conversion, since it "was a part of the stalk field and as such belonged" to defendant. This brings us to a consideration of the paragraph of the lease quoted near the beginning of this opinion.

The paragraph involved is not inconsistent with the provisions for harvesting and dividing the main crop. The lease should be construed as a whole. After providing for rental "on a 50-50 basis" and designating the manner of procedure as to the "seed line" rows taken over by the seed company, it continues: "the pollinator and all isolation rows will be shucked by the tenant, and the landlord's share shall be put in the crib on the farm."

The later paragraph now in question imposes a similar duty on the tenant as to any substantial amount "remaining in the cornfield after the picking." It imposes the same duty on the tenant to pick and divide it equally. Such undue remaining amount is part of the crop. It seems more likely "an undue amount" will remain after the picking has been done by machine, than if done by hand.

The paragraph's opening sentence, "The stock (or stalk) fields shall belong to the landlord", does not limit or define the technical ownership of the corn after it matures or is on the ground. In either case the parties are owners in equal shares until division is made. The tenant retains possession of the whole for that purpose. The corn is personal property and subject to conversion as such. Durflinger v. Heaton, 219 Iowa 528, 533, 258 N.W. 543, and cases cited; 89 C.J. S., Trover and Conversion, section 28; Clark v. Strohbeen, 190 Iowa 989, 992, 181 N.W. 430, 13 L. R. A. 1419; Goldstein v. Mundon, 202 Iowa 381, 383, 210 N.W. 444.

The amount on the ground after the mechanical picker went through (we repeat) was a part of the crop. If plaintiff wanted his share he was entitled to an opportunity to gather it up so he could divide it and secure his share. And if he failed to gather it defendant might complain and contend the amount was "undue" or substantial. The decision was for plaintiff in the first instance. And he certainly would be entitled to a reasonable time and opportunity. Under the record the jury should have

been allowed to determine that issue. It would be impossible, when the lease is drawn, to fix an absolute period. And what constitutes a reasonable time becomes a fact question under all the relevant circumstances when the parties disagree.

III. The only evidence here is that the seed company came and got its seed line corn after plaintiff had all the end row and part of the pollinator corn gathered. Saturday of that same week (October 23) plaintiff finished harvesting the pollinator rows. And by the uncontradicted evidence he had approached defendant the preceding Thursday proposing a plan whereby the corn that remained would not need to be gathered and divided but defendant could take immediate possession. Defendant neither rejected nor agreed to the proposal. They came to no conclusion. The fact that the mechanical picker was removed indicated no abandonment by plaintiff of his share of what had to be gathered by hand.

As the evidence stood when the motion to direct was filed, there was no factual failure of proof as to plaintiff's having an interest in the corn on the ground. There was no proof as a matter of law that plaintiff had abandoned the corn remaining in the field, or as yet had had any adequate opportunity to gather it after he finished the end and pollinator rows on Saturday. An invitation to gather it with defendant's animals already in the field could hardly be considered an opportunity as a matter of law. The conversion had already been consummated.

IV. Defendant's argument seems to assume or imply some technical reason or reasons why this action for conversion would not lie. We have already said the property taken over by the act of defendant was personalty. A conversion is properly defined as a distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his title or rights therein, or in derogation, exclusion or defiance of such title or rights. 53 Am. Jur., Trover and Conversion, sections 24, 50, 51, 75. See also 89 C. J. S., Trover and Conversion, sections 35, 36; also Goeman v. Live Stock National Bank, 238 Iowa 1088, 1094, 29 N.W.2d 528, 10 A. L. R.2d 452, quoting Mulenix v. Fairfield Nat. Bk., 203 Iowa 897, 899, 209 N.W. 432, citing Brown v. Dubuque Altar Mfg. Co., 163 Iowa 343, 144 N.W. 613.

 "Although the general rule is that an action for conversion lies only with respect to personal property * * * it is clear that an action may be maintained for the conversion of property severed from the real estate." 53 Am. Jur., Trover and Conversion, section 20; 89 C. J. S., Trover and Conversion, section 1 et seq.

Some claim is made that the evidence was inadequate to establish the proper measure of damage should plaintiff be held entitled to recover. We think there was sufficient. Mathematical precision, under the situation revealed by the record, could not be required. Sample rows were gathered and the result measured. The number of rows and the value of corn were shown. The computation was for the jury.

 Further discussion and citation are unnecessary. We hold the direction of verdict as the record stood was error. The decision must be and is reversed.—Reversed.

All JUSTICES concur.